FEDERAL ELECTION COMMISSION, Plaintiff,

v.

NATIONAL CONSERVATIVE POLITICAL ACTION COMMITTEE, Defendant.

No. 84 Civ. 0866 (GLG).

United States District Court, S.D. New York.

May 15, 1986.

Charles N. Steele, Gen. Counsel to the Federal Election Com'n, Washington, D.C. by Ivan Rivera, Asst. Gen. Counsel, Lisa E. Klein, of counsel, for the plaintiff.

Herge, Sparks, Christopher & Biondi, McLean, Va. by Robert R. Sparks, Jr., of counsel and Ford, Marrin Esposito & Witmeyer, New York City by William P. Ford, of counsel, for defendant Nat. Conservative Political Action Committee.

## OPINION

GOETTEL, District Judge:

The Federal Election Commission (the "FEC"), a federal agency empowered with exclusive jurisdiction to administer, interpret and enforce the Federal Election Campaign Act of 1971 ("FECA"; "the Act"), brought this action against the National Conservative Political Action Committee ("NCPAC") seeking declaratory and injunctive relief. NCPAC is a non-profit, non-membership organization registered in the District of Columbia to support or oppose candidates for elective office. During the period in question (March 1981—August 1982), NCPAC was registered with the FEC as a multicandidate political committee ("MCPC").[1] The FEC contends that during the 1982 New York senatorial campaign, NCPAC contributed more than $5000 to a single candidate in violation of section 441a(a)(2)(A) of the Act.[2] In failing to report these contributions, NCPAC allegedly violated section 434(b)(4)(H)(i) of the Act as well.[3] This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (1982).

Both parties now cross-move, pursuant to the Fed.R.Civ.P. 56, for summary judgment. NCPAC also moves, pursuant to Fed.R.Civ.P. 15 to amend its answer. For the purposes of this motion, the defendant's answer is deemed amended. For the reasons stated below, the plaintiff's motion for summary judgment is granted.

### I. Background

The following facts are not in dispute. During the 1981–82 election cycle, NCPAC established "New Yorkers Fed Up with Moynihan," a political action committee dedicated to defeating the reelection bid of New York's United States Senator, Daniel Patrick Moynihan. NCPAC hired Arthur J. Finkelstein Associates ("Associates"), a polling and political consulting firm owned and operated by Arthur J. Finkelstein, to develop a media strategy, to conduct and analyze polls and to select election issues on which Senator Moynihan was most vulnerable. Finkelstein himself wrote the script for NCPAC's main radio commercial urging the defeat of Senator Moynihan. From April 1981 until August 1982 NCPAC funnelled $73,755 to Associates to urge Moynihan's defeat.

In March 1981, prior to the commencement of NCPAC's anti-Moynihan effort, Bruce Caputo announced his intention to seek the Republican nomination for the U.S. Senate seat in New York. On or about that time, Caputo and his political committee, the Caputo for Senate Committee (the "Committee"), retained Finkelstein, a longtime friend of the candidate, as a paid political consultant. Between March 1981 and March 1982, when Caputo with-

---

1. Section 441a(a)(4) defines a multicandidate political committee ("MCPC") as "a political committee which has been registered for a period of not less than 6 months, which has received contributions from more than 50 persons, and ... has made contributions to 5 or more candidates for Federal office." 2 U.S.C. § 441a(a)(4) (1982).

2. Section 441a(a)(2)(A) restricts the amount a MCPC may contribute to a candidate as follows: "No multicandidate political committee shall make contributions—to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000." 2 U.S.C. § 441a(a)(2)(A) (1982).

3. Section 434(b)(4)(H)(i) requires multi-candidate political committees to disclose all "contributions made to other political committees," including those to a candidate's political committee. 2 U.S.C. § 434(b)(4)(H)(i) (1982).

drew from the race,[4] the Committee paid Finkelstein's firm $28,000 to assist in all of the aspects of Caputo's campaign including formulating election strategy, hiring campaign staff, and utilizing the media.

Finkelstein and NCPAC also had long been associated,[5] and, during the time NCPAC retained Finkelstein, it knew that Finkelstein was working directly for Caputo. In fact, it was Finkelstein who recruited Robin Martin, a Caputo campaign volunteer, to head the "New Yorkers Fed Up with Moynihan" media campaign.

In January 1982, the FEC received a complaint from the New York State Democratic Committee alleging that independent expenditures reported by NCPAC for its anti-Moynihan campaign were actually in-kind contributions to Caputo and his authorized committee.[6] The complaint further alleged that these contributions exceeded section 441a(a)(2)(A)'s $5,000 limit on contributions to a candidate and that, NCPAC had violated section 434(b)(4)(H)(i) by failing to report the contributions. The FEC found reason to believe these allegations and, in April 1982, began an investigation.[7] In September 1983 the FEC found probable cause to believe that NCPAC had violated FECA's contribution and disclosure requirements and attempted to correct these violations through informal methods.[8] These methods failed[9] and, on February 6, 1984, the FEC brought this action to enforce the provisions of the Act.[10]

---

4. Caputo exaggerated his military record and was forced to resign from the race after the press exposed the exaggerations.

5. Finkelstein served on NCPAC's board of directors from May 1978 until May 1979.

6. Section 437g(a)(1) of the Act provides, in pertinent part,

   Any person who believes a violation of [FECA] ... has occurred, may file a complaint with the Commission. Such complaint shall be in writing, signed and sworn to by the person filing such complaint.... Within 5 days after receipt of a complaint, the Commission shall notify, in writing, any person alleged in the complaint to have committed such a violation....

   2 U.S.C. § 437g(a)(1) (1982).

7. If the Commission, upon receiving a complaint ... determines, by an affirmative vote of 4 of its members, that it has reason to believe that a person has committed, or is about to commit, a violation of this Act ..., the Commission shall, through its chairman or vice chairman, notify the person of the alleged violation. The Commission shall make an investigation of such alleged violation....

   2 U.S.C. § 437g(a)(2) (1982).

8. Sections 437g(a)(3) and 437g(a)(4)(A)(i) provide, in pertinent part,

   (3) The general counsel of the Commission shall notify the respondent of any recommendation to the Commission by the general counsel to proceed to a vote on probable cause....

   (4)(A)(i) [I]f the Commission determines, by an affirmative vote of 4 of its members, that there is probable cause to believe that any person has committed ... a violation of

[FECA].... [T]he Commission shall attempt, for a period of at least 30 days, to correct or prevent such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved. Such attempt by the Commission to correct or prevent such violation may continue for a period of not more than 90 days. The Commission may not enter into a conciliation agreement under this clause except pursuant to an affirmative vote of 4 of its members....

   2 U.S.C. §§ 437g(a)(3); 437g(a)(4)(A)(i) (1982).

9. The New York State Democratic Committee had also alleged that the Caputo Committee had accepted in excess of $5,000 in in-kind contributions from NCPAC and had failed to report those contributions in violation of Sections 441a(a) and 434 of the Act. 2 U.S.C. §§ 441a(a) & 434 (1982). The Caputo Committee entered into a conciliation agreement with the Federal Election Commission ("the Commission") on December 2, 1983.

10. Section 437g(a)(6)(A) provides, in pertinent part,

   If the Commission is unable to [informally] correct or prevent any violation of this Act ... the Commission may, upon an affirmative vote of 4 of its members, institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order (including an order for a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation) in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business.

   2 U.S.C. § 437g(a)(6)(A) (1982).

## II. *Discussion*

Section 441a(a)(2)(A) of the Act forbids a multicandidate political committee from making a contribution "to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceeds $5000." 2 U.S.C. 441a(a)(2)(A) (1982). Expenditures made "in cooperation, consultation, or concert, with, ... a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate."[11] 2 U.S.C. § 441a(a)(7)(B)(i) (1982). FEC regulations clarify this language.[12] According to those regulations, the aforementioned definition of contribution includes any expenditure "[m]ade with the cooperation or with the prior consent of, or in consultation with, or at the request or suggestion of, a candidate or any agent ... of the candidate...." 11 C.F.R. § 109.1(b)(4) (1986). This definition, in turn, encompasses

[a]ny arrangement, coordination or direction by the candidate or his or her agent prior to the publication, distribution, display, or broadcase of the communication. An expenditure will be presumed to be so made when it is—

(A) Based on information about the candidates plans, projects, or needs provided to the expending person by the candidate, or by the candidate's agents, with a view toward having an expenditure made;

(B) Made by or through any person who is, or has been, authorized to raise or expend funds, who is, or has been, an officer of an authorized committee, or who is, or has been, receiving any form of compensation or reimbursement from the candidate, the candidate's committee or agent....

*Id.* at § 109.1(b)(4)(i). The FEC argues that the $73,755 NCPAC expended through Finkelstein, who was Caputo's agent, actually constituted contributions to the Caputo campaign. NCPAC thereby exceeded the $5,000 limit on contributions[13] and violated the corresponding disclosure provisions.

NCPAC does not dispute that, on their face, the statute and the relevant regulations forbid its conduct. It, nevertheless, maintains that it can prevail on its cross-motion for summary judgment because it relied on an FEC advisory opinion.[14] Under the Act,

any person involved in the specific transaction or activity with respect to which [an] advisory opinion [has been] rendered ... [and] who [has] relied upon [that] advisory opinion ... and who act[ed] in good faith in accordance with the provisions and findings of [that] advisory opinion shall not, as a result of any such act be subject to any sanction provided by [FECA].

2 U.S.C. §§ 437f(c)(1)(A) & (2) (1982). NCPAC claims to have relied in good faith on a December 1980 advisory opinion and asserts that it would not have exceeded the

---

**11.** The term "contribution" includes, *inter alia*, "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office...." 2 U.S.C. § 431(8)(A)(i) (1982). An "independent expenditure" is defined in section 431(17) (1982) as an "expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made without cooperation or consultation with any candidate, or any authorized committee or agent of such candidate, and which is not made in concert with, or at the request or suggestion of, any candidate, or any authorized committee or agent of such candidate." 2 U.S.C. § 431(17) (1982). Independent expenditures are exempted from the Act's contribution limits.

**12.** Section 438(a)(8) of the Act charges the Commission with prescribing "rules, regulations, and forms to carry out the provisions of [FECA]." 2 U.S.C. § 438(a)(8) (1982). The FEC's interpretations are entitled to deference. *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981).

**13.** NCPAC spent $16,500 after Caputo withdrew from the race. Since it could lawfully contribute $5000 to Caputo's campaign, its contribution exceeded the lawful limit by $52,255.

**14.** Pursuant to section 437f(a)(1), the FEC, upon the request of any person, "shall render a written advisory opinion relating to [a specific transaction or activity.]" 2 U.S.C. § 437f(a)(1) (1982).

$5000 contribution limit had it believed it was acting contrary to the provisions of the Act.

In December 1979, NCPAC wrote to the FEC requesting an advisory opinion with regard to certain proposed activities it was contemplating. NCPAC was particularly concerned about whether an agency relationship between a political consultant or any other vendor and a candidate would jeopardize its ability to use the same consultant or vendor to oppose the candidate's opponent.[15] NCPAC posited nine, fact-specific questions to the FEC. It now contends that it relied on the FEC's responses to two of those questions in taking the actions that are the subject of this suit.

**15.** NCPAC prefaced its inquiry with three general questions:

1. Whether, in light of the independent expenditure regulations, NCPAC is prohibited from engaging a particular consultant or vendor of goods or services, in connection with making independent expenditures advocating defeat of a clearly identified candidate, if that consultant or vendor has also been separately engaged (1) by an opponent of that candidate, or (2) by a potential opponent of that candidate?

2. Does NCPAC have an affirmative duty to inquire of prospective consultants whether or not they have been so engaged?

3. Must NCPAC impose a contractual restriction on a consultant or vendor regarding for whom they may provide services or goods?

Exhibit A at 1. NCPAC's Memorandum of Points and Authorities [hereinafter "NCPAC Memorandum"]. The Commission's response to these general questions simply reiterates the presumption of coordination detailed in the Commission's regulations. *See supra* p. 4. Neither NCPAC nor the Commission place any reliance on the Commission's response to the general questions.

**16.** Situation one and the response thereto is excerpted below.

*Situation 1.* NCPAC proposes to engage an advertising firm for the purpose of designing the layout and text of print advertisements advocating the defeat of a candidate for the Democratic nomination for President. The firm would do all the research and creative work involved in designing the advertisements. The advertising firm has previously been engaged by the authorized campaign committee of a candidate for the Republican nomination for President. Is the advertising firm an "agent" as defined in 11 CFR 109.-1(b)(5)? Would the response to that question

The first question (or "situation," as NCPAC termed it) posits NCPAC hiring an advertising firm to design advertisements which advocate the defeat of a candidate campaigning for the Democratic nomination for President. This same agency is working for a candidate seeking the Republican nomination. Although the Commission did not have enough information to determine whether the firm was an "agent" of the Republican candidate, it noted that since these "are two separately distinct races ... and the Democratic candidate and the Republican candidates are not opponents at this point" it would be permissible to retain the same advertising agency.[16] NCPAC's Memorandum of Law, Exhibit A at 4.

be different if the same advertising firm renders a distinctly different type of service to the authorized campaign committee of the candidate for Republican nomination for President, e.g. operates and manages a telephone bank for the purpose of soliciting contributions to the committee?

*Answer 1.* The request does not present sufficient information for the Commission to determine whether the advertising firm is an agent, as defined in 11 CFR 109.1(b)(5), of the Republican candidate. Moreover, the situation presented concerns an advertising firm engaged to do work for what in 1980 are two separate, distinct races; that is, provide services for NCPAC to make independent expenditures advocating the defeat of a candidate for the Democratic nomination for President when the firm has previously provided services to the campaign committee of a candidate for the Republican nomination for President. Since these are two distinct races the Democratic candidate and the Republican candidate are not opponents at this point. Thus, the Commission concludes that it does not appear from these facts that the prior engagement by the Republican candidate's committee of the firm would preclude NCPAC from engaging the firm to make independent expenditures in opposition to the Democratic candidate for nomination. If, however, this Republican candidate for nomination becomes the nominee, NCPAC would presumably be precluded from engaging the advertising firm to make independent expenditures during the general election. This same response applies to the activity raised in your request as an example of a different type of service.

NCPAC Memorandum, Exhibit A at 4.

The eighth situation posits NCPAC contributing a poll undertaken as part of an independent expenditure campaign against a candidate for the Democratic senatorial nomination to a candidate for the Republican nomination in the same state. The FEC stated that contributing the poll results "would, of course, constitute a contribution in-kind by NCPAC to the candidate's campaign committee." *Id.* at 9–10. However, during the primary campaign, NCPAC could "communicate" with the Republican candidate.[17]

The advisory opinion contained the caveat that "an expenditure that appears to be independent on the facts presented [by NCPAC] may not in fact be so [in a different factual setting]". *Id.* at 4. Moreover, section 437f(c)(1)(B) of FECA provides that an advisory opinion can be relied on only if the "specific transaction or activity [is] indistinguishable in all its material aspects from the transaction or activity ... [about] which the advisory opinion [was] rendered." 2 U.S.C. § 437f(c)(1)(B) (1982). Thus, NCPAC can prevail in this action only if it can establish that the situation at bar is indistinguishable from the situations reviewed in the advisory opinion.

Careful analysis reveals substantial dissimilarities between the facts in issue and those posited in the FEC's advisory opinion, First, Finkelstein's role was far more crucial than that of the specified "agents" in situations 1 and 8. Second, NCPAC's coordination with Caputo, through Finkelstein, far exceeded the "communication" sanctioned by the FEC. Finally, Caputo and Moynihan were more like opponents than like the candidates in "separate and distinct races" envisioned by the FEC.

### A. Finkelstein's Role

In the two "situations" upon which it relies, NCPAC hypothesized an advertising firm that would work simultaneously for NCPAC and for a Republican candidate and a polling concern working for NCPAC that would contribute a poll to the Republican candidate. The role of Finkelstein and his firm in both the NCPAC and Caputo efforts was far more significant than that of a vendor of advertising services or a polling concern. Finkelstein was NCPAC's key strategist. He formulated and directed the execution of NCPAC's plan to defeat Senator Moynihan. Finkelstein drafted NCPAC's radio spots and recruited the chairman of NCPAC's anti-Moynihan effort. Simultaneously, he served as the chief architect of Bruce Caputo's campaign. Finkelstein helped prepare the candidate's announcement speech and initial fundraising letter. He also chaired staff meetings, made recommendations with respect to staff assignments, and authored, in large part, the Caputo Committee's campaign commercials. Although the general questions with which NCPAC prefaced its request for an advisory opinion referred to

---

**17.** Situation eight and the response thereto is excerpted below.

> *Situation 8.* NCPAC, as part of its independent expenditure program in opposition to the election of a candidate for the Democratic nomination for the Senate in State A, conducted a poll. Among other things, the poll results showed certain data relevant to a particular candidate for the Republican nomination for election to the Senate in State A. May NCPAC contribute the poll to the Republican candidate in accordance with 11 CFR 106.-4(b)? May NCPAC engage in any communication with the Republican candidate or with the Republican party committee in State A?
>
> *Answer 8.* The Commission is of the opinion that NCPAC may contribute poll results to a candidate for the Republican nomination for election to the Senate in State A if done in accordance with Commission regulation 106.-

4(b). This would, of course, constitute a contribution inkind by NCPAC to the candidate's campaign committee. During the primary election period NCPAC may communicate with the Republican candidate or with the Republican party committee in State A. However, if the Republican candidate should become the nominee, that communication could preclude NCPAC from making independent expenditures regarding the candidates in the general election in State A. Moreover, depending upon the communications NCPAC has with the Republican party committee in State A and the party committee's relationship with the Republican candidate, NCPAC could be precluded from then making independent expenditures in the general election in State A.

NCPAC Memorandum, Exhibit A at 9.

"consultants," *see supra* n. 15, neither that general reference, nor the specific references in situations 1 or 8 to an "advertising firm" or a "poll," can reasonably be interpreted to apply to a key campaign strategist for both a candidate and a committee making independent expenditures designed to defeat that candidate's future opponent.

### B. Communication v. Coordination

NCPAC asserts that it communicated with the Caputo campaign in reliance on the FEC's answer to situation 8 which stated, "During the primary election period NCPAC may communicate with the Republican candidate...." *See supra* n. 17. According to NCPAC's Chairman, John T. Dolan: "We believed all communications ... between [us] and [the] agents for the Caputo for the Senate Committee were 100 percent legal up until the time ... Mr. Caputo got the nomination." FEC Memorandum of Law, Exhibit No. 4, Deposition of John T. Dolan at 46. In fact, NCPAC believed the advisory opinion permitted NCPAC and the Caputo committee to "coordinate" their activities. Dolan thus asserted,

> If someone can tell me the difference between communication and coordination, I would like them to tell me what it is.
>
> I can't believe when we asked this opinion the Federal Election Commission thought we meant communications discussing the weather. We were very specific in the types of information we asked about in that Advisory Opinion, and communications to any normal, rational human being, I am sure, would imply as related to political information.

FEC Memorandum of Law, Exhibit No. 4, Deposition of John T. Dolan at 53.

As part of its strategy, NCPAC commissioned a poll from Finkelstein to assess Moynihan's strengths and weaknesses and to determine the best way to oppose him. NCPAC then shared the results of its poll, which revealed Moynihan's vulnerabilities and profiled public attitudes about crucial issues, with the Caputo campaign. Were this the extent of NCPAC's consultation with the Caputo committee, it might fall within the realm of communication sanctioned by the advisory opinion. But NCPAC went much further.

A comparison of the NCPAC and Caputo campaign materials evidences extensive consultation and coordination. The materials are remarkably similar in style, content and language. In Caputo's announcement speech and initial fundraising letter, for example, Senator Moynihan is said to have "voted to give away the Panama Canal" and "voted against capital punishment." Exhibits to Defendant [sic] Federal Election Commission's Motion for Summary Judgment, Exhibit 22. Senator Moynihan is also labelled the "father of the runaway welfare system," rated by the American Conservative Union as "the most liberal Senator, tied with George McGovern, more liberal in fact than Ted Kennedy." *Id.*, Exhibit 21. NCPAC's radio spot repeats these same allegations almost word for word. Moynihan is depicted therein as having "voted to give away the Panama Canal," as having "voted against capital punishment," and as "the father of our runaway welfare system." NCPAC's radio spot also refers to Moynihan's American Conservative Union rating, and contrasts Moynihan's record with those of Senators Kennedy and McGovern. *Id.*, Exhibit 17.[18]

According to NCPAC, the advisory opinion permits communication and coordination between NCPAC and a Republican candidate, the result of which are a NCPAC "independent expenditure" campaign and a campaign for the Republican nomination that are mirror images of one another. That NCPAC overstates the scope of permissible communication is made plain by the degree of coordination that NCPAC would have the advisory opinion sanction.

---

**18.** The following table illustrates the similarity of the anti-Moynihan and pro-Caputo media campaigns.

### C. The Primary/General Election Distinction

NCPAC's final contention is that it relied on the advisory opinion's distinction between (1) a political consultant who works for NCPAC in opposing a Democratic candidate for the nomination while also performing services for a candidate for the Republican nomination and (2) a consultant who supports the Republican candidate during the general election and, at the same time, assists NCPAC in opposing that candidate's opponent. No doubt the answers to both situations 1 and 8 recognize the primary/general election distinction. And, indeed, Moynihan and Caputo were candidates in separate primary races. However, the primary/general election distinction is blurred beyond recognition in this case. Caputo and Moynihan were, for all practical purposes, opponents. When Caputo announced his candidacy in September 1981, no other Republican was seeking that nomination.[19] Two months later, in November 1981, NCPAC announced its drive to unseat Moynihan. At that time, Moynihan was the only Democratic candidate.[20]

Finkelstein's strategy makes clear that Caputo and Moynihan were more than simply candidates in separate primaries. Before his withdrawal, Caputo was the front-runner to win the Republican nomination. Thus, Finkelstein's strategy for Caputo was to preempt the field and make Caputo the only viable Republican candidate.

| "ISSUE" | CAPUTO CAMPAIGN MATERIALS | NCPAC CAMPAIGN COMMERCIAL |
|---|---|---|
| Panama Canal | "voted to give away the Panama Canal" | "voted to give away the Panama Canal" |
| Capital Punishment | "voted against capital punishment" | "voted against capital punishment" |
| Foreign Aid | "voted for foreign aid to Communist Cambodia, Cuba, Laos and Viet Nam" | "even voted foreign aid to communist countries like Cuba, Cambodia and Vietnam" |
| Tax Cut | "against giving you a 10% income tax cut" | "supports increased taxes" |
| Welfare | "father of the runaway welfare system" | "helped develop our runaway welfare system" |
| Spending | "opposed the President's plan to reduce federal spending" | "opposed cutting back on government spending" |
| ACU Rating | "ranking him the most liberal Senator" | "the most liberal Senator" |
| Kennedy – McGovern Comparison | "tied with George McGovern, more liberal in fact than Ted Kennedy" | "more liberal than Ted Kennedy . . . tied McGovern for most liberal" |

FEC Memorandum of Law, Appendix A.

**19.** *Senator Moynihan Gets Challenger for 1982,* N.Y. Times, Sept. 16, 1981, § 2, at B5, col. 1. Whitney North Seymour, Jr., Muriel Siebert, and Florence Sullivan thereafter entered the Republican primary—but not until at least two months after Caputo withdrew from the race. *See Seymour Begins Race for Moynihan's Seat,* N.Y. Times, May 4, 1982, § 2, at B2, col. 6; Lynn, *Muriel Siebert Joins G.O.P. Race for U.S. Senate,* N.Y. Times, May 26, 1982, § 2, at B1, col. 3; *State Legislator From Brooklyn in Bid for Senate—Florence Sullivan Seeks a 3–Party Candidacy,* N.Y. Times, June 3, 1982, § 2, at B2, at col. 1. Fed.R.Evid. 401 empowers this Court to take judicial notice of these indisputable facts.

**20.** Pursuant to rule 401 of the Fed.R.Evid., this Court takes judicial notice of the fact that Moynihan was unopposed for the Democratic nomination until at least January 1982. *Klenetsky to Seek Moynihan's Job,* N.Y. Times, January 28, 1982, § 2, at B13, col. 3. No opponent presented a viable challenge for the nomination.

Finkelstein consciously set out to make Caputo Moynihan's tacit opponent during primary period.[21] Thus, Finkelstein had Caputo open his campaign with an attack on Moynihan. NCPAC ignores the reality when it contends that Caputo and Moynihan were in two distinct races in the same sense as the hypothetical candidates in the FEC's advisory opinion. NCPAC's expenditures were not only hurting Moynihan, they were aiding Caputo. More important for our purposes, they were increasing Caputo's chances for success in any future general election confrontation with Moynihan. The FEC's concern about coordination between contributions to a candidate and expenditures against that candidate's opponent is clearly implicated by NCPAC's anti-Moynihan activities.

It matters not that Caputo never actually opposed Moynihan in a primary or general election. Had Caputo not departed the race, Moynihan and Caputo may well have remained opponents through the general election. Caputo's withdrawal prior to the primary does not negate the impact of any prior conduct that may have violated the federal election laws.

The distinctions between the facts as they actually unfolded and the facts addressed in the FEC's advisory opinion are patent. Finkelstein's central role in both the NCPAC and Caputo efforts, the obvious coordination between the two efforts, their shared goals and parallel strategies, and the posture of the Caputo/Moynihan contest together demonstrate an impermissible degree of coordination and preclude any reliance on the advisory opinion. Any such reliance would overstep the wording of the advisory opinion and contradict its underlying spirit as well. Simply put, the advisory opinion does not sanction NCPAC and a Republican candidate to develop and implement, through a common political consultant, nearly identical campaigns—regardless of whether those campaigns take place during the primary or general election season.[22]

### III. *Conclusion*

NCPAC's anti-Moynihan expenditures must be deemed contributions to the Caputo campaign. NCPAC thus exceeded FECA's $5000 limit on contributions by a multi-candidate political committee to a candidate or its political committee and violated the Act's disclosure requirements by failing to report its contributions. The plaintiff's motion for summary judgment is granted. The defendant's cross-motion for summary judgment is denied.

The plaintiff will enter judgment accordingly.

---

**21.** NCPAC contends that Congressman Jack Kemp was its preferred candidate. Kemp, in fact, never entered the race.

**22.** In 1980, the Commission's General Counsel recommended that the Commission adopt an interpretation of the advisory opinion in issue, which interpretation NCPAC contends is similar to that proferred by the FEC in this case. The Commission, nevertheless, declined to pursue the matter. NCPAC asserts that it relied on the Commission's rejection of its General Counsel's interpretation of the advisory opinion. However, reliance on the Commission's rejection of a particular interpretation provides no support for NCPAC's position. Nowhere does the Act sanction such reliance.