CHAMBER OF COMMERCE OF the
UNITED STATES of America, et
al., Appellants,

v.

FEDERAL ELECTION COMMISSION,
Appellee.

No. 94–5339.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 10, 1995.

Decided Nov. 14, 1995.

that in effect limits "members"—to whom a membership organization can convey political messages and solicitations—to individuals having the right to vote, directly or indirectly, for at least one member of the organization's highest governing body. The district court thought appellants lacked standing and that the case was not ripe, but held that the FEC's rule was a reasonable interpretation of "member." We reverse and remand with an order to issue the requested declaratory relief.

## I.

The Federal Election Campaign Act generally prohibits any corporation or labor organization from making contributions or expenditures "in connection with any election." 2 U.S.C. § 441b(a). But it allows corporations to solicit contributions from stockholders, executive and administrative personnel, and their families; labor organizations to solicit members and their families; and membership organizations or nonstock corporations to solicit members. 2 U.S.C. §§ 441b(b)(4)(A) & (C). Also exempted are expenditures made for "any communication by any membership organization or corporation to its members, stockholders, or executive or administrative personnel" (so long as the organization is not organized primarily for the purpose of influencing a federal election). 2 U.S.C. § 431(9)(B)(iii). The statutory structure thus contemplates three types of organizations—stock corporations, labor organizations, and membership organizations or nonstock corporations—with analogous exemptions from § 441b's restrictions for solicitation of and political communication to their constituents. "Membership organization" and "member" are not defined. In 1976, the FEC issued regulations defining "member" as

> all persons who are currently satisfying the requirements for membership in a membership organization, trade association, cooperative, or corporation without capital stock.... A person is not considered a member under this definition if the only requirement for membership is a contribution to a separate segregated fund.

Carter G. Phillips, argued the cause, for appellants, with whom Michael A. Nemeroff, Jonathan E. Nuechterlein, Stephen A. Bokat, Judith K. Richmond, and Jack R. Bierig were on the brief.

Richard B. Bader, Associate General Counsel, Federal Election Commission, argued the cause, for appellee, with whom Lawrence M. Noble, General Counsel, and Vivien Clair, Attorney, were on the brief.

Before: SILBERMAN, SENTELLE, and HENDERSON, Circuit Judges.

SILBERMAN, Circuit Judge:

The United States Chamber of Commerce and the American Medical Association challenge the Federal Election Commission's rule

11 C.F.R. § 114.1(e) (1977–1993). This definition was construed in subsequent Advisory Opinions and court decisions to require some financial attachment or a certain level of organizational attachment. In 1993, the FEC promulgated a new, more restrictive definition of "member":

> *Members* means all persons who are currently satisfying the requirements for membership in a membership association, affirmatively accept the membership association's invitation to become a member, and either:
>
> (i) Have some significant financial attachment to the membership association, such as a significant investment or ownership stake (but *not* merely the payment of dues);
>
> (ii) Are required to pay on a regular basis a specific amount of dues ... *and are entitled to vote directly either for at least one member* who has fully participatory and voting rights on the highest governing body of the membership association, or for those who select at least one member ...; or
>
> (iii) Are entitled to vote directly for all of those on the highest governing body of the membership association.

11 C.F.R. § 114.1(e)(2) (emphasis in original; latter emphasis added).

The Chamber is a nonprofit corporation that promotes the free enterprise system. Its constituents include 3,000 state and local chambers of commerce, 1,250 trade and professional groups, and 215,000 "direct business members." All constituents pay annual dues ranging from $65 to $100,000. A self-perpetuating Board of 63 members governs the Chamber, but 59 policy committees play a significant role in determining the Chamber's position on various issues. The Chamber has traditionally published and distributed endorsement reports on, and has sponsored meetings with, various federal candidates. Under the prior regulatory definition of "member," all of the Chamber's constituents

were included. Under the FEC's new rule, only the 63 members of the self-perpetuating Board qualify as members.

The AMA is a nonprofit corporation, the constituents of which include approximately 290,000 physicians and medical students who belong either directly to the national association or through their membership in state medical associations. AMA constituents pay annual dues ranging from $20 for medical students to $420 for physicians, receive various AMA publications, participate in professional programs, and are bound by, and subject to discipline under, the Principles of Medical Ethics. The AMA's House of Delegates has 435 members elected by members of the state medical associations; individuals who do not belong to state associations—the approximately 44,500 "direct" members—cannot vote for House members. The House determines AMA policy on—among other issues—health care legislation, professional liability, and medical ethics. The AMA solicits its constituents for contributions to its political action committee, which contributes to various federal candidates' campaigns, and endorses candidates that support the AMA's position on important issues. Under the FEC's new rule (but not the old one), the more than 44,500 physicians who do not belong to local medical associations are no longer AMA "members." The only difference between individuals who qualify as AMA "members" under the new definition and those who do not, is the right to vote for at least one member of the governing board; the two groups of individuals have otherwise identical rights, obligations, and benefits.

Once the FEC promulgated its new rule, the Chamber and the AMA ceased making their traditional political communications and solicitations to the individuals whose status is in dispute, rather than risk enforcement proceedings by the FEC. Both organizations requested Advisory Opinions from the FEC—the sole administrative remedy.[1] The

---

1. An organization also may petition for an exemption under § 114.1(e)(3), which allows the Commission, on a case-by-case basis, to designate individuals as "members" of the organization even if they do not meet the rule's requirements. But we are told, and it is not contradicted, that a majority of the Commissioners has already determined to allow such exemptions *only where* the individuals in question have "voting rights"; the regulation itself gives as an example of an appropriate exemption student

FEC's general counsel recommended, in draft Advisory Opinions, that the 220,000 individuals and organizations in the Chamber (*i.e.,* everyone other than the 63 Board members) and the 44,500 "direct" members of the AMA do not meet the requirements of membership under the new rule. The Commissioners split three-three over whether to adopt the drafts, so no Advisory Opinion issued. However, four of the six Commissioners agreed that the plain terms of the rule required the result recommended by the general counsel; one of the Commissioners who voted against adopting the drafts did so solely because she had reconsidered her earlier support for the final rule and believed it should be withdrawn. The AMA and the Chamber then filed a challenge to the final rule, seeking a declaratory judgment that the rule was invalid and an injunction against its enforcement. The district court agreed with the FEC that there was no standing and the controversy was not ripe, but went on to hold that the rule was valid on the merits as a reasonable interpretation of "member," without, however, addressing the implications of appellants' First Amendment arguments for the standard of review.

## II.

■ The Commission contends vigorously that appellants have not suffered cognizable injury and therefore lack Article III standing. Whatever the rule's definition of "members," the Commission split three-three on whether to issue an Advisory Opinion. Therefore, appellants are not faced with any present danger of an enforcement proceeding, because such an action, like an Advisory Opinion, requires a majority vote of the Commission. Nothing, however, prevents the Commission from enforcing its rule at any time with, perhaps, another change of mind of one of the Commissioners. The rule constitutes the purported legal norm that binds the class regulated by statute. In the last federal election, appellants, not surprisingly, felt constrained to alter their prior practice— they ceased political communications with those constituents who did not qualify as "members" under the Commission's new

rule. And counsel for the Commission agreed at oral argument—as he really had to—that he would not advise the Chamber and the AMA to ignore the rule. All of this would seem to confer standing on appellants, but there is much more.

This statute is unusual in that it permits a private party to challenge the FEC's decision *not* to enforce. 2 U.S.C. § 437g(a)(8). *See, e.g., FEC v. National Right to Work Comm.,* 459 U.S. 197, 200–01, 103 S.Ct. 552, 556, 74 L.Ed.2d 364 (1982) (*NRWC*) (competing lobbying group filed a complaint with the FEC, initiating enforcement action); *Akins v. FEC,* 66 F.3d 348, 349 (1995) (political competitors filed complaint with the FEC, and then challenged dismissal of complaint under § 437g(a)(8)). If appellants were to communicate with persons who were not "members" under the FEC's new definition, a political competitor could challenge the Commission's dismissal of its complaint. And it would be easy to establish that such agency action was contrary to law; the Commission's refusal to enforce would be based not on a dispute over the meaning or applicability of the rule's clear terms, but on the Commission's unwillingness to enforce its own rule. *See Democratic Congressional Campaign Comm. v. FEC,* 831 F.2d 1131, 1132–34 (D.C.Cir.1987) (stating that the court needs to examine the Commissioners' reasons for dismissing a complaint to determine if the refusal to enforce a rule was contrary to law); *Reuters Ltd. v. FCC,* 781 F.2d 946, 947–49 (D.C.Cir. 1986) (noting that an agency "is not at liberty to depart from its own [clear] rules" and that no deference is accorded such an agency decision to depart). Therefore, even without a Commission enforcement decision, appellants are subject to litigation challenging the legality of their actions if contrary to the Commission's rule.

■ We must bear in mind also that appellants claim that the rule infringes on their First Amendment rights. A party has standing to challenge, pre-enforcement, even the constitutionality of a *statute* if First Amendment rights are arguably chilled, so long as there is a credible threat of prosecu-

members paying lower dues who retain voting     rights.

tion. *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 642–643, 98 L.Ed.2d 782 (1988); *Meese v. Keene,* 481 U.S. 465, 472–73, 107 S.Ct. 1862, 1866–67, 95 L.Ed.2d 415 (1987). Since an agency rule, unlike a statute, is typically reviewable without waiting for enforcement, *Abbott Labs. v. Gardner,* 387 U.S. 136, 139–41, 87 S.Ct. 1507, 1510–12, 18 L.Ed.2d 681 (1967), this case is *a fortiori* to the statutory cases. We conclude that the Commission's standing argument is rather weak and easily reject it. For similar reasons, we discard the Commission's even weaker claim that the question of the validity of the rule is not ripe. The issue presented is a relatively pure legal one that subsequent enforcement proceedings will not elucidate. *Id.* at 149, 87 S.Ct. at 1516.

## III.

The Commission points out that the word "member" is not defined in the statute, and it can have a range of meanings. We are told therefore, under the *Chevron* doctrine, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we should defer to the Commission's interpretation. The FEC also relies heavily on the Supreme Court's opinion in *NRWC,* 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364, a case similarly involving the meaning of "members" of a nonprofit corporation under § 441b(b)(4)(C). There, the NRWC took the position that all persons who had at one time responded to random mass mailings with a financial contribution or other response were "members" within the meaning of the Act, even though the individuals had never designated themselves as members nor been so designated by the NRWC. The Commission rejected that view. We held that the Commission's position ran afoul of constitutional concerns, but the Supreme Court reversed, concluding that the FEC's construction did not raise "any insurmountable constitutional difficulties." *Id.* at 206, 103 S.Ct. at 558. The Court examined the legislative history and its own prior opinions and reiterated the constitutionality of the Act based on the government's interest in preventing both actual and apparent corruption. Although the Court recognized that a not-for-profit organization did not raise the concerns that animated the statute's bar on the diversion of a for-profit corporate treasury into the political process, it pointed out that

> [t]he statute reflects a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation. While § 441b restricts the solicitation of corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress' judgment that it is the potential for such influence that demands regulation.

*Id.* at 209–10, 103 S.Ct. at 560–61. (citation omitted). The Court declined to "attempt an exegesis of the statutory meaning of the word 'members,'" but it rejected the NRWC's interpretation and indicated that "'members' of nonstock corporations were to be defined, at least in part, by analogy to stockholders of business corporations and members of labor unions ... [which] suggest[ed] that some relatively enduring and independently significant financial *or* organizational attachment is required ..." *Id.* at 203–04, 103 S.Ct. at 557–58 (emphasis added). The Commission asserts that its new rule is consistent with the Supreme Court's analysis.

Appellants, on the other hand, argue that the Commission's rule ignores the plain meaning of the word "members," and that even if ambiguous, we should not defer to the Commission's interpretation in light of the grave constitutional issues at stake. Appellants further contend that a careful reading of *NRWC* supports their position—not that of the Commission. The Commission is accused of ignoring the disjunctive "or" between the words "financial" and "organizational" in the Supreme Court's opinion. The Commission's rule focuses, according to appellants, only on organizational attachment, which is defined by the right to vote for at least one member of the governing body.

■ We do not agree that "members" has a plain meaning; the Supreme Court quite clearly recognized, by not attempting an "exegesis," that the word has a range of

possible meanings. It may well be, as appellants contend, that the Commission's interpretation is a strained one—or at least not an obvious one—but it is impossible to conclude that the word can have only one meaning. We do agree with appellants, however, that the interpretation the Commission has codified presents serious constitutional difficulties. The Supreme Court's opinion in *NRWC* does not imply that the Commission was entirely free to adopt a definition of members without regard to First Amendment concerns. The Commission's rule, after all, precludes appellants from communicating on political subjects with thousands of persons, heretofore regarded by the Commission as members. The Supreme Court long ago, construing the forerunner of the present statute, recognized an organization's—in that case a union's—First Amendment right to communicate with its "members." *United States v. CIO*, 335 U.S. 106, 121, 68 S.Ct. 1349, 1356, 92 L.Ed. 1849 (1948). It is obvious that too restrictive a definition of member—as the Commission's here—would burden that right. We are obliged to construe the statute to avoid constitutional difficulties if such a construction is not plainly contrary to the intent of Congress. Accordingly, the Commission is not entitled to *Chevron* deference with regard to its interpretation of the statute. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *Bell Atl. Tel. Co. v. FCC*, 24 F.3d 1441, 1445 (D.C.Cir.1994).

■ The crucial issue, then, is whether the Commission's rule accords with the Supreme Court's reasoning in *NRWC*. We think not. The Court observed that Congress meant members of "nonstock corporations" to be defined by analogy to stockholders or union members. It was in that context that the Court said "some relatively enduring and independently significant financial or organi-

zational attachment is required." 549 U.S. at 204. Of course, no one owns equity shares in a nonstock corporation, so by referring to a financial attachment, the Court presumably implied something similar to dues. It is hard to imagine other financial attachments that would typically apply to nonstock corporations.[2] Yet, implicit in the Commission's rule is the view that dues, no matter how high, are not by themselves a manifestation of a significant financial attachment. That position, as appellants argue, reads the disjunctive "or" as if the Court used the conjunctive "and." It is also quite illogical to regard someone who has one share of stock in a public corporation, which can be sold in minutes, as more significantly attached to the organization than a person or entity who pays $1000 or even $100,000 (as is the case for some Chamber members) in annual dues.

As with the Commission's view of financial attachment, the rule's voting requirements ignore other indications of organizational attachment. The rule would exclude the 44,500 doctors who are not members of state medical associations and therefore do not elect the House of Delegates. But these doctors, whose connection to the organization is direct at the national level, have bound themselves, like their colleagues in the state medical associations, to the Principles of Medical Ethics—which means they are subject to sanction by the organization. It might be thought, that for a professional, placing oneself in such a position is the *most* significant organizational attachment. The Chamber of Commerce has a self-perpetuating Board, but at least 1,500 members participate in the policy formulating committees, which for such an organization is clearly an important function. The Commission attempts to justify its voting requirement by asserting that the appropriate analogy here is with unions, and union members are guaranteed—because of the Landrum–Griffin Act—the right to vote for union officers. But the Supreme

2. The Commission, somewhat offhandedly, mentions as the only example a seat on a stock exchange. *See Final Rule, Definition of "Member" of a Membership Association*, 58 Fed.Reg. 45,770, 45,733 (Aug. 30, 1993). It does not explain, however, exactly how it regards such an attachment as compared to other indicia of membership on an exchange, nor why it regards a seat which is transferable as a more significant attachment than annual dues. When paid out over years, annual dues may well be considered more than sunk costs—providing, for example, seniority benefits.

Court in *CIO,* 11 years before the Landrum–Griffin Act was passed in 1959, had little difficulty in concluding that union members were "members" without regard to their voting rights. Even today, the Landrum–Griffin Act does not cover unions that are composed solely of public employees, 29 U.S.C. § 402(e).[3]

Even were we not troubled by the constitutional concerns raised by the Commission's rule, and even if we thought it could be squared with the Supreme Court's opinion in *NRWC,* in other words if we accepted the Commission's statutory interpretation—which we do not—we would regard the Commission's rule as arbitrary and capricious under the APA (if this had been squarely argued on appeal). The rule explicitly but inexplicably excludes from its definition certain labor unions that would otherwise be covered (§ 441b designates individuals belonging to labor organizations as "members" and 11 C.F.R. § 100.8 defines "membership association" to include labor organizations). "Notwithstanding the requirements [of membership], members of a local union are considered to be members of any national or international union of which the local union is a part and of any federation with which the local, national, or a international union is affiliated." 11 C.F.R. § 114.1(e)(4). The Commission also exempts "federated farm and rural electric cooperatives" from the membership requirements, even though it expressly acknowledges that they "do not have the precise financial and organizational ties required by these rules." 58 Fed.Reg. at 45,773. These exemptions apparently avoid the "membership" difficulties created by the hierarchical structure among the units of a national or international union and among affiliates of farm and rural electrical cooperatives. But it is precisely this type of hierarchical structure that is forbidden to the Chamber and the AMA if they desire to treat all their constituents as "members." The Commission makes no defense of this differential treatment before this court. The Final Rule, 58 Fed.Reg. at 45,773, also provides no explanation. The Notice of Proposed Rulemaking, *Definition of "Member" of a Membership Association,* 57 Fed.Reg. 46,346, 46,346 (Oct. 8, 1992), merely states that the labor union exemption is "[c]onsistent with the FECA's legislative history." With no further elaboration from the Commission on this point, and in light of the countervailing legislative history noted by appellants (expressly naming the AMA as an organization whose membership rights would be unaffected by FECA), we would determine that these exemptions make the regulation arbitrary and capricious.

\* \* \* \* \* \*

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded with instructions to grant declaratory relief consistent with this opinion.

---

**3.** This also raises the interesting question as to whether all American unions are treated the

same under the Commission's rule.