PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

VIRGINIA SOCIETY FOR HUMAN LIFE,
INCORPORATED,
              *Plaintiff-Appellee,*

v.                                          No. 00-1252

FEDERAL ELECTION COMMISSION,
              *Defendant-Appellant.*

VIRGINIA SOCIETY FOR HUMAN LIFE,
INCORPORATED,
              *Plaintiff-Appellant,*

v.                                          No. 00-1332

FEDERAL ELECTION COMMISSION,
              *Defendant-Appellee.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-99-559)

Argued: February 26, 2001

Decided: September 17, 2001

Before WILLIAMS and MICHAEL, Circuit Judges, and
Cynthia H. HALL, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Michael wrote the opinion, in which Judge Williams and Senior Judge Hall joined.

---

## COUNSEL

**ARGUED:** David Brett Kolker, FEDERAL ELECTION COMMIS-SION, Washington, D.C., for Appellant. James Bopp, Jr., BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Appellee. **ON BRIEF:** Lawrence M. Noble, General Counsel, Richard B. Bader, Associate General Counsel, FEDERAL ELECTION COMMISSION, Washington, D.C., for Appellant. James R. Mason, III, BOPP, COLE-SON & BOSTROM, Terre Haute, Indiana; VIRGINIA SOCIETY FOR HUMAN LIFE, Richmond, Virginia, for Appellee.

---

## OPINION

MICHAEL, Circuit Judge:

The Virginia Society for Human Life, Inc. (VSHL) sued the Federal Election Commission (FEC), seeking a declaration that 11 C.F.R. § 100.22(b), a regulation defining "express advocacy" for purposes of the Federal Election Campaign Act (FECA), is unconstitutional. VSHL also sought an injunction prohibiting the FEC from enforcing the regulation and an order directing the FEC to open a rulemaking to consider repeal of the regulation. The district court ruled in favor of VSHL, holding that the regulation is unconstitutional and enjoining the FEC from enforcing the regulation against VSHL or any other party in the United States. On appeal the FEC raises standing and ripeness arguments, which we reject because VSHL faces a credible threat of prosecution under the regulation. On the merits of VSHL's claim, we hold that the regulation is unconstitutional because it is not limited to communications that contain express words of advocacy as required by *Buckley v. Valeo*, 424 U.S. 1 (1976). However, the nationwide injunction, preventing the FEC from enforcing the regulation against all parties in the United States, is too broad. The injunction will be limited to barring the FEC from proceeding against

VSHL. Last of all, we reject VSHL's cross-appeal for an order requiring the FEC to initiate rulemaking to consider repeal of the regulation. Our holding that the regulation is unconstitutional and the injunction that we have authorized give VSHL complete relief.

I.

VSHL is a Virginia-based nonprofit corporation established "to promote the pro-life cause." VSHL spends money from its treasury for communications to the public that promote its views. As the 2000 federal elections were approaching, VSHL was interested in spending money on communications it regarded as "issue advocacy." In particular, VSHL planned to distribute "voter guides," which would indicate federal candidates' positions and VSHL's own position on particular abortion-related issues. VSHL also planned to produce radio advertisements that would air one week before the election. These ads would compare the records and positions of the candidates for President and U.S. Senator for Virginia on issues relating to abortion. VSHL wanted to target Virginia residents in the northern Virginia metropolitan area. In order to reach this audience, VSHL intended to place the ads on at least one radio station whose broadcast was received by listeners in the District of Columbia. The radio station selected would be located either in northern Virginia or in the District.

On January 6, 1999, VSHL submitted a petition for rulemaking to the FEC, requesting that it repeal 11 C.F.R. § 100.22(b), which defines "express advocacy" for purposes of the corporate expenditure prohibitions found in FECA. VSHL claimed that because § 100.22(b)'s definition of "express advocacy" was overly broad, some of the group's planned issue advocacy communications might constitute improper election expenditures. VSHL noted that the regulation had already been struck down in the First Circuit and the Southern District of New York. The FEC should repeal the regulation, VSHL urged, so that groups distributing nationwide messages would not be judged by different rules in different locales. On February 3, 1999, the FEC published a notice in the Federal Register informing the public of VSHL's petition and opening a month-long comment period. *See* Rulemaking Petition: Definition of "Express Advocacy"; Notice of Availability, 64 Fed. Reg. 5200 (Feb. 3, 1999). Seven indi-

viduals or organizations submitted comments, five in favor of the petition and two in opposition. On April 29, 1999, the FEC voted 3-3 on two motions involving VSHL's petition. The first 3-3 vote came on a motion to adopt the General Counsel's recommendation that the Commission decline to open a rulemaking. The second split vote came on a motion to direct the General Counsel to initiate a rulemaking. Because neither motion received an affirmative vote of four Commissioners as required by 2 U.S.C. § 437c(c), the FEC announced that it was taking no further action on VSHL's petition. *See* 64 Fed. Reg. 27478 (May 20, 1999).

On August 9, 1999, VSHL sued the FEC in federal court in eastern Virginia seeking declaratory and injunctive relief. VSHL sought a declaration that the FEC's failure to act on VSHL's petition was contrary to law and that 11 C.F.R. § 100.22(b) is unconstitutional. In addition, VSHL requested an injunction ordering the FEC to grant its petition for rulemaking and prohibiting the FEC from bringing an enforcement action under 11 C.F.R. § 100.22(b). On September 22, 1999, six weeks after VSHL sued, the FEC voted 6-0 to adopt a policy that 11 C.F.R. § 100.22(b) would not be enforced in the First or Fourth Circuits because the regulation "has been found invalid" by the First Circuit and "has *in effect* been found invalid" by the Fourth Circuit. (emphasis added). Based on this expression of policy, the FEC moved to dismiss VSHL's complaint for lack of subject matter jurisdiction on the ground that VSHL had no standing to sue. The district court denied the motion, reasoning that VSHL's activities extend beyond the Fourth Circuit, that private citizens can initiate FECA enforcement, and that the FEC's nonbinding policy vote does not dissipate the chill created by the existence of the regulation. Next, the parties filed cross-motions for summary judgment. In ruling on these motions the district court held that the regulation ran afoul of the First Amendment because it regulates issue advocacy, not just express advocacy. In addition, the district court enjoined the FEC "from enforcing 11 C.F.R. [§] 100.22(b) against the VSHL or against any other party in the United States of America." The court, however, declined to order the FEC to open a rulemaking to repeal the regulation. The FEC appeals the ruling on standing and the scope of the injunction. VSHL cross-appeals on the rulemaking issue.

## II.

The issues in this appeal are better understood with a review of the case law leading up to and following the promulgation in 1995 of 11 C.F.R. § 100.22. Our starting point is *Buckley v. Valeo*, 424 U.S. 1 (1976), where the Supreme Court first introduced the concept of "express advocacy." The constitutionality of various provisions of FECA were at issue in *Buckley*. One of these provisions was 2 U.S.C. § 434(e), which required that "[e]very person (other than a political committee or candidate) who makes contributions or expenditures, other than by contribution to a political committee or candidate, in an aggregate amount in excess of $100 within a calendar year shall file with the supervisory officer a statement containing the information required by [this] section." Federal Election Campaign Act of 1971, Pub. L. No. 92-225, § 305, 86 Stat. 3, 16 (amended 1974). "Contribution" and "expenditure" were defined in § 431(e)(1) and (f)(1) as using money or other things of value "for the purpose of influencing the nomination for election, or election, of any person to Federal office." § 301, 86 Stat. at 11-12.

The *Buckley* Court limited § 434(e) "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S. at 80 (footnote omitted). In other words, the communications had to contain "express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 80 n.108 (citing *id.* at 44 n.52). This limitation ensured that Congress was only regulating "spending that is unambiguously related to the campaign of a particular federal candidate" and not regulating "issue discussion and advocacy of a political result." *Id.* at 79-80. After adopting this construction of § 434(e), the Court upheld the provision against a constitutional attack, reasoning that it "bears a sufficient relationship to a substantial government interest," that is, "furthering First Amendment values by opening the basic processes of our federal election system to public view." *Id.* at 80, 82.

Congress amended FECA in 1976. *See* Pub. L. No. 94-283, 90 Stat. 475. One of the 1976 provisions prohibits corporations from making "a contribution or expenditure in connection with any [federal] election" if the contribution or expenditure comes out of the corporation's

general treasury. 2 U.S.C. § 441b(a). In *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986) (*MCFL*), the Supreme Court used the principles it had laid out in *Buckley* to hold that "an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of § 441b." *Id.* at 249. Specifically, the "discussion of issues and candidates" should be distinguished from "more pointed exhortations to vote for particular persons." *Id.*[1]

One circuit case, *FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987), decided before 11 C.F.R. § 100.22 was adopted, should also be mentioned. In *Furgatch* the FEC brought an enforcement action against Harvey Furgatch under 2 U.S.C. § 434(c) for failing to report his expenditures for political advertisements he placed in *The New York Times* and *The Boston Globe* the week before the 1980 presidential election. Section 434(c)'s reporting requirements are expressly limited to expenditures that "expressly advocat[e] the election or defeat of a clearly identified candidate." 2 U.S.C. § 431(17). Furgatch's ads, which were aimed at President Carter, were captioned and ended with the statement, "DON'T LET HIM DO IT." They included disparaging comments about President Carter, including: "The President of the United States continues degrading the electoral process and lessening the prestige of the office."; "In recent weeks, Carter has tried to buy entire cities, the steel industry, the auto industry, and others with public funds."; "His meanness of spirit is divisive and reckless McCarthy-

---

[1]*MCFL* arose out of an enforcement action that the FEC brought against MCFL for its distribution of a "Special Edition" newsletter before the September 1978 primary elections. The publication, entitled "EVERYTHING YOU NEED TO KNOW TO VOTE PRO-LIFE," identified every candidate for state and federal office in Massachusetts as either supporting or opposing MCFL's positions on abortion issues. The "Special Edition" newsletter also contained photographs of thirteen candidates whose views mirrored those of MCFL. Finally, the newsletter included a clippable coupon that voters could remove and take with them to the polls as a reminder of the candidates' positions. *See id.* at 243-44. The Court considered this newsletter "express advocacy." *See id.* at 249-50. However, it held that § 441b's restrictions were unconstitutional as applied to MCFL because MCFL was more like a voluntary political association than a business entity. Thus, the restrictions lacked the traditional compelling justification of limiting corporate power in the political arena. *See id.* at 263-64.

ism at its worst."; "If he succeeds the country will be burdened with four more years of incoherencies, ineptness and illusion, as he leaves a legacy of low-level campaigning." *See id.* at 858-59.

The Ninth Circuit in *Furgatch* developed a standard for defining "express advocacy" under FECA:

> [S]peech need not include any of the words listed in *Buckley* to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate. This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is "express" for present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed "advocacy" if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be "express advocacy of the election or defeat of a clearly identified candidate" when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action.

*Id.* at 864. Applying this standard, the Ninth Circuit concluded that Furgatch's ads constituted express advocacy of the defeat of President Carter. *See id.* at 864-65.

Drawing on *Buckley*, *MCFL*, and *Furgatch*, the FEC in 1995 adopted a new regulation, revising its definition of "express advocacy." *See* Express Advocacy; Independent Expenditures; Corporate and Labor Organization Expenditures, 60 Fed. Reg. 35292, 35294 (July 6, 1995). The new definition, found at 11 C.F.R. § 100.22, provides:

> *Expressly advocating* means any communication that—
> (a) Uses phrases such as "vote for the President," "re-elect your Congressman," "support the Democratic nominee,"

"cast your ballot for the Republican challenger for U.S. Senate in Georgia," "Smith for Congress," "Bill McKay in '94," "vote Pro-Life" or "vote Pro-Choice" accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, "vote against Old Hickory," "defeat" accompanied by a picture of one or more candidate(s), "reject the incumbent," or communications of campaign slogan(s) or individual word(s), which in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s), such as posters, bumper stickers, advertisements, etc. which say "Nixon's the One," "Carter '76," "Reagan/Bush" or "Mondale!"; or

(b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because—

(1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and

(2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

The regulation went into effect on October 5, 1995. *See* Final rules; Announcement of Effective Date, 60 Fed. Reg. 52069 (Oct. 5, 1995). Soon after, pro-life groups began to challenge the constitutionality of subpart (b). The first case was *Me. Right to Life Comm., Inc. v. FEC*, 914 F. Supp. 8 (D. Me.) (*MRLC*), *aff'd per curiam*, 98 F.3d 1 (1st Cir. 1996) (affirming "for substantially the reasons set forth" by the district court). The First Circuit held that 11 C.F.R. § 100.22(b) was contrary to FECA, whose reach had been limited to "express advocacy" by the Supreme Court and a prior First Circuit case. The court's specific reasoning is as follows. First, although subpart (b) of the regulation "appears to be a very reasonable attempt to deal with [the] vagaries of language," it has the potential to intrude on issue advo-

cacy because it will still require the speaker, before he speaks, to "pause to debate the shades of meaning in language." *Id.* at 11-12. Second, "the speaker must continually re-evaluate his or her words as the election approaches" because the regulation's scope is dependent on the timing of the communication. *Id.* at 13. Therefore, the court struck down § 100.22(b), holding that the regulation chilled the plaintiff's First Amendment rights. *See id.*

The next challenge to subpart (b) of the regulation came in *Right to Life of Dutchess County, Inc. v. FEC*, 6 F. Supp. 2d 248 (S.D.N.Y. 1998) (*RLDC*). There, the court held that by omitting any requirement that the communications include express words of advocacy, 11 C.F.R. § 100.22(b) ran afoul of the First Amendment. *See id.* at 253-54. Like the *MRLC* court, the *RLDC* court reasoned that *Buckley*'s "bright-line requirement of 'express' or 'explicit' words of advocacy of election or defeat of a candidate is necessary to avoid prohibitions on 'issue discussions,' which are plainly protected from regulation by the First Amendment." *Id.* at 253. The regulation's definition, the court found, "encompass[es] substantially more communication than is permissible" for the FEC to regulate. *Id.* at 254. The FEC decided not to appeal to the Second Circuit.

We are now the third court to be presented directly with the question of whether 11 C.F.R. § 100.22(b) is constitutional.[2]

### III.

Before considering the merits of the case, we must decide whether we are presented with a justiciable controversy. The FEC argues that VSHL has no standing to bring this action and that the case is not ripe for review. We review these issues de novo. *See Marshall v. Meadows*, 105 F.3d 904, 905-06 (4th Cir. 1997). We hold that VSHL has standing to sue because it faces a credible threat of prosecution. We also hold that VSHL's allegations are sufficient to create a ripe controversy.

---

[2]In *FEC v. Christian Action Network, Inc.*, 110 F.3d 1049 (4th Cir. 1997) (*CAN II*), we considered the "express advocacy" limitation imposed by *Buckley*, but not in the context of whether 11 C.F.R. § 100.22(b) is constitutional.

A.

The FEC's first justiciability argument is that VSHL lacks standing to sue. To establish standing, a plaintiff must show three things: (1) an injury in fact, (2) a causal connection between the plaintiff's injury and the defendant's conduct, and (3) a likelihood that the injury will be redressed by a decision favorable to the plaintiff. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks and citations omitted). When a party, like VSHL in this case, brings a preenforcement challenge to a statute or regulation, it must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest," and there must exist "a credible threat of prosecution" under the statute or regulation. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). The fear of prosecution cannot be imaginary or wholly speculative. *See id.* at 298, 302.

The FEC argues that VSHL faces no credible threat of prosecution because the FEC has adopted a policy of not enforcing 11 C.F.R. § 100.22(b) in the Fourth Circuit. The FEC maintains that it adopted this policy because our decision in *FEC v. Christian Action Network, Inc.*, 110 F.3d 1049 (4th Cir. 1997) (*CAN II*), in effect invalidated the regulation. Although we were critical of 11 C.F.R. § 100.22(b) in *CAN II*, our discussion of the regulation was dicta. And whatever the true force of the FEC's policy statement, there are other reasons why VSHL faces a credible threat of civil enforcement action or prosecution for the advocacy communications it intends to undertake.

We begin with our *CAN II* decision, which the FEC says forecloses it from enforcing the regulation in the Fourth Circuit. But *CAN II* did not strike down 11 C.F.R. § 100.22. The communications leading to the *CAN* case took place before the FEC promulgated the regulation. The FEC brought an enforcement action against CAN for violating various provisions of FECA. *See FEC v. Christian Action Network*, 894 F. Supp. 946 (W.D. Va. 1995), *aff'd per curiam*, No. 95-2600, 1996 WL 431996 (4th Cir. Aug. 2, 1996) (*CAN I*). One of the provisions the FEC invoked against CAN was 2 U.S.C. § 441b(a), which, after *MCFL*, 479 U.S. 238, 249 (1986), prohibits only corporate

expenditures for express advocacy in connection with a federal election. CAN, a nonprofit corporation that "seeks to inform the public about issues which it believes affect 'traditional Christian family values,'" 894 F. Supp. at 948, had used its general treasury funds to produce television and print advertisements in the weeks before the 1992 presidential election. These ads criticized then-candidates Bill Clinton and Al Gore for what CAN considered their "militant homosexual agenda." *Id.* The FEC argued that the imagery and nonverbal components of the ads, as opposed to the actual words, amounted to express advocacy for the defeat of Clinton and Gore. The district court dismissed the lawsuit, holding that the ads did not constitute express advocacy and that it was inappropriate to interpret the meaning behind the images. *See id.* at 957-59. We affirmed on the district court's reasoning. *See* 1996 WL 431996.

CAN then filed an application with us for the fees and costs it incurred in defending the FEC's prosecution and appeal of the case. CAN applied under 28 U.S.C. § 2412, the section dealing with fees and costs when the United States is a party. Under this provision "a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." § 2412(d)(1)(A). We held that CAN was entitled to fees and costs because the FEC's position that the imagery of CAN's advertisements made them express advocacy was not substantially justified "in light of the Supreme Court's unambiguous pronouncements in *Buckley* and *MCFL* that explicit words of advocacy are required." *CAN II*, 110 F.3d at 1061. We also pointed out that the FEC lacked substantial justification for its position in the *CAN* case in light of the "string of losses" it had suffered "in [lower court] cases between the FEC and issue advocacy groups over the meaning of the phrase 'express advocacy' and the permissible scope of the FEC's regulatory authority over corporate political speech." *Id.* at 1055. We mentioned several of these cases, including *MRLC*, 914 F. Supp. 8 (D. Me.), *aff'd per curiam*, 98 F.3d 1 (1st Cir. 1996). We noted that *MRLC* had "invalidated that portion of the FEC's new regulatory definition of 'express advocacy' [in 11 C.F.R. § 100.22(b)] which, in substance, is the definition the FEC urged upon us" and the district court in the *CAN* litiga-

tion. *CAN II*, 110 F.3d at 1054. This statement, read in context, can be taken as criticism of the definition of "express advocacy" contained in 11 C.F.R. § 100.22(b). The purpose of the statement, however, was to show that *MRLC* is just another indication that the FEC did not have "substantial justification" for its expansive approach in determining what constitutes "express advocacy." The statement about § 100.22(b) did not decide the question before us today — whether the regulation is constitutional. Indeed, prior to the time VSHL filed this case and the FEC adopted its nonenforcement policy in the Fourth Circuit, the FEC took the position that *CAN II*'s limited discussion about the regulation was dicta. *See* Defendant Federal Election Commission's Reply to Plaintiff's Opposition to the Commission's Motion to Amend Judgment at 4 n.1, *Right to Life of Dutchess County Inc. v. FEC*, 97 Civ. 2614 (SHS) (S.D.N.Y. July 20, 1998). Our decision in *CAN II* does not defeat VSHL's standing to challenge the regulation.

Our decision in *CAN II* aside, the FEC argues that its policy statement removes any threat of prosecution. VSHL, in turn, relies on *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999) (*NCRL*), to argue that the FEC's policy statement is not entitled to any weight. In *NCRL* a nonprofit corporation that advocates the pro-life position challenged the constitutionality of various provisions of North Carolina law relating to elections and campaign finance. One of these provisions required political committees to register and file regular reports with the state and to maintain detailed accounts of contributions and expenditures. *See id.* at 709 (citing N.C. Gen. Stat. §§ 163-278.7(b), .8, .9, .11). NCRL was concerned that it would be considered a political committee because it distributed voter guides. *See id.* (citing N.C. Gen. Stat. § 163-278.6(14)). It therefore challenged the definition of "political committee" on the ground that it encompassed groups that engaged in issue advocacy. North Carolina argued that there was no case or controversy because the state had interpreted the statute to allow for voter guide distribution, as long as the guide did not contain candidate endorsements. North Carolina emphasized that it had never applied the definition to an issue advocacy group in the twenty-five years since the statute's enactment. *See id.* at 710.

We rejected North Carolina's argument. We first noted that when a statute on its face restricts a party from engaging in expressive

activity, there is a presumption of a credible threat of prosecution. *See id.* "This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights." *Id.* We then pointed out that the North Carolina statute facially restricts NCRL's present and future expressive activities. In dealing with North Carolina's argument that there was no threat of prosecution, we said:

> The State's litigation position—that it does not interpret section 163-278.6(14) to encompass issue advocacy—fails to alter our analysis in this case. The record does not indicate that the Board has promulgated a rule exempting from its definition of political committee those entities that engage in issue advocacy only. Nor does the record indicate that the local district attorneys have any intention of refraining from prosecuting those who appear to violate the plain language of the statute.

> NCRL is left, therefore, with nothing more than the State's promise that NCRL's officers will face no criminal penalties if NCRL distributes its voter guide without registering as a political committee. NCRL's First Amendment rights would exist only at the sufferance of the State Board of Elections. It has no guarantee that the Board might not tomorrow bring its interpretation more in line with the provision's plain language. Without such a guarantee, NCRL will suffer from the reasonable fear that it can and will be prosecuted for failing to register and file the necessary disclosures, and its constitutionally protected speech will be chilled as a result.

*Id.* at 710-11 (citations omitted). Because the statute's plain language prohibited NCRL's activities, North Carolina's nonbinding assurances that NCRL would not be prosecuted did not overcome the presumption of a credible fear of prosecution.

The FEC's policy of nonenforcement, adopted by the FEC in a closed meeting, is somewhat more formal than the promise made during litigation by the State in *NCRL*. On the other hand, the FEC's policy is not contained in a final rule that underwent the rigors of notice

and comment rulemaking. *Cf. Chamber of Commerce v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995) ("The rule constitutes the purported legal norm that binds the class regulated by statute."). Instead, the policy is recorded in FEC minutes that do not carry the binding force of law. The Commissioners who adopted the policy might be replaced with ones who disagree with it, or some of the Commissioners who voted might change their minds. A simple vote of the Commission, in other words, could scuttle the policy. *See id.* ("Nothing . . . prevents the Commission from enforcing its rule at any time with, perhaps, another change of mind of one of the Commissioners."). *But see Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 191-94 (3d Cir. 1990) (booklet granting exemptions to certain statutory provisions was enough to make controversy nonjusticiable).

In any event, we do not have to decide whether the FEC's policy is so easy to change that the regulation's continuing presence chills constitutionally protected speech, making it reasonable for VSHL to refrain from engaging in its planned communications. Even if the FEC's policy statement remains in place, it is too narrow to fully protect VSHL because the policy is limited to the Fourth Circuit. VSHL alleges that during the 2000 election it intended to engage in issue advocacy outside of the Fourth Circuit. To assist in getting its message to residents of the northern Virginia metropolitan area, VSHL planned to place its advertisements on at least one radio station whose broadcast is received in the District of Columbia. This would have required the use of a radio station physically located either in northern Virginia or in the District. VSHL intends to engage in similar advertising activity outside of this circuit in the future. The FEC has in the past prosecuted groups in the judicial districts where they distributed advertising materials, as opposed to the states where they are chartered or headquartered. *See, e.g.*, *FEC v. Pub. Citizen, Inc.*, 64 F. Supp. 2d 1327 (N.D. Ga. 1999) (D.C. organization prosecuted in Georgia for "Boot Newt" television advertisement that aired in Atlanta and for distribution of postcards to Georgia voters); *FEC v. Nat'l Conservative Political Action Comm.*, 647 F. Supp. 987 (S.D.N.Y. 1986) (D.C. organization prosecuted in New York for activities related to campaign to defeat Senator Daniel Patrick Moynihan). The FEC has not given any assurances that it will refrain from enforcing 11 C.F.R. § 100.22(b) in the District of Columbia.

Finally, the FEC maintains that VSHL's allegations are too speculative to confer standing. To establish standing for a preenforcement challenge to a regulation, it is enough to "allege[ ] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a [regulation]." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). VSHL has alleged an intention to engage in constitutionally protected activities that would fall within the reach of the regulation. It would engage in some of these activities outside of the Fourth Circuit, where its fear of prosecution is even more reasonable than within the Fourth Circuit. The allegations of future intentions cannot be speculative or imaginary, of course, *see id.*, and the injury must be imminent, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). At the time that VSHL filed suit, the 2000 election was only fifteen months away. VSHL's injury — its fear of prosecution — was not only imminent but immediate because it needed to plan the substance and placement of its advertisements. Furthermore, federal elections recur every two years, making VSHL's injury ongoing. *Cf. id.* at 564 (holding that injury was not imminent because plaintiffs' affidavits only stated that they would return to previously visited places "some day" and gave no concrete descriptions of their plans). VSHL has alleged that it "intends to continue to spend money to communicate with the general public as it has in the past." VSHL's intended activities both inside and outside the Fourth Circuit are concretely described, and they further support its credible fear of prosecution.

For all of these reasons, we hold that VSHL has standing to bring this lawsuit against the FEC.

### B.

The FEC's second justiciability argument is that the case is not ripe for review. Here, the FEC maintains, like it did in its standing argument, that VSHL's allegations about its planned activities are not sufficiently concrete. Ripeness concerns the "appropriate timing of judicial intervention." *Renne v. Geary*, 501 U.S. 312, 320 (1991). The doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). A court must "evaluate both the fitness of

the issues for judicial decision and the hardship to the parties of with-holding court consideration." *Id.* at 149.

The issue in this case is fit for judicial decision at this stage. VSHL is bringing a facial challenge to a regulation that has the force of law and carries stiff criminal and civil penalties. The case presents a "purely legal" issue and further factual development will not assist us in our resolution. *Id.* at 149. *See also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985); *Chamber of Commerce v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995). Moreover, VSHL will face a significant impediment if we delay consideration of the regulation's constitutionality. The presence of the regulation requires VSHL "to adjust [its] conduct immediately." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (noting that these types of "substantive rule[s]" are "'ripe' for review at once"). It must refrain from distributing communications that fall within 11 C.F.R. § 100.22(b) or risk prosecution. Our decision today is not an abstract interpretation, but a clarification of the conduct that VSHL can engage in without the threat of penalty. Therefore, we hold that the controversy is ripe for review. *See Abbott Labs.*, 387 U.S. at 153 ("Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts . . . must be permitted . . . .").[3]

---

[3]Even though VSHL's intended communications were geared towards an election that has already passed, there is no mootness problem. This case falls under the exception for a case that is capable of repetition yet evades review because of the length of time required for the courts to resolve the matter. *See DeFunis v. Odegaard*, 416 U.S. 312, 318-19 (1974). In addition, VSHL has alleged that it "intends to continue to spend money to communicate with the general public as it has in the past." *See Ark. AFL-CIO v. FCC*, 11 F.3d 1430, 1435 (8th Cir. 1993) ("The parties must demonstrate a reasonable expectation that the event complained of will recur with respect to themselves.").

IV.

A.

We turn now to the merits of this case—whether 11 U.S.C. § 100.22(b) is unconstitutional. In district court the FEC ultimately conceded that the regulation is invalid in this circuit because of *CAN II*, 110 F.3d 1049 (4th Cir. 1997). The district court undertook its own analysis and held that the regulation violates the First Amendment. In its brief to us the FEC argues that the regulation is constitutional. However, the FEC says that because this panel is bound by *CAN II*, the constitutionality of § 100.22(b) "can only become a live issue in this case if this Circuit hears the matter *en banc*, or if the Supreme Court grants a petition for a writ of certiorari." Opening Br. for FEC at 50. As we have already said, *CAN II* did not consider the constitutionality of the regulation, so we are free to decide that issue.

The regulation under challenge provides:

> *Expressly advocating* means any communication that—
> . . .
>
> (b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because—
>
> (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and
>
> (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

11 C.F.R. § 100.22(b).

Above in part II we noted that the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 80 (1976), limited the reach of FECA § 434(e) to corporate expenditures for "express advocacy," that is, "communications that include explicit words of advocacy of election or defeat of a candidate." *Id.* at 43. We also noted in part II that in *MCFL*, 479 U.S. 238, 249 (1986), the Court imposed *Buckley*'s "express advocacy" limitation upon FECA § 441b(a), the section that underlies the regulation at issue here. *MCFL*, of course, drew a sharp distinction between "express advocacy" ("more pointed exhortations to vote for particular persons") and "issue advocacy" ("discussion of issues and candidates"). *Id.*

Again, our decision in *CAN II* did not consider whether 11 C.F.R. § 100.22(b) is constitutional. *CAN II* does nevertheless reveal how narrowly and strictly our circuit reads the "express advocacy" limitation of *Buckley* and *MCFL*. We summed up *Buckley*'s holding as follows: "the Federal Election Campaign Act [can] be applied consistently with the First Amendment only if it [is] limited to expenditures for communications that literally include *words which in and of themselves* advocate the election or defeat of a candidate." *CAN II*, 110 F.3d at 1051 (emphasis added). This holding, we said, confirms the Supreme Court's "commitment to an interpretation of the Constitution that permits the prohibition only of corporate political communications that employ express words of advocacy." *Id.* at 1052. We stressed in *CAN II* that the Supreme Court in *Buckley* "opted for the clear, categorical limitation, that only expenditures for communications using explicit words of candidate advocacy are prohibited, so that citizen participants in the political processes would not have their core First Amendment rights to political speech burdened by apprehensions that their advocacy of issues might later be interpreted by the government as, instead, advocacy of election result." *Id.* at 1051. Our discussion in *CAN II* then moved to *MCFL*. In *MCFL*, we said, the Court engrafted *Buckley*'s "explicit words of advocacy" limitation onto § 441b(a) because of "*Buckley*'s rationale, that the divide between discussion of issues and candidates and election advocacy is so obscure as to require a prophylactic definition in order to give the widest berth to First Amendment freedoms." *Id.* at 1052. All in all, we concluded, *Buckley* and *MCFL* make it "indisputable that the Supreme Court limited the FEC's regulatory authority to expenditures

which, through explicit words, advocate the election or defeat of a specifically identified candidate." *Id.* at 1062.

Under the regulation in question, 11 C.F.R. § 100.22(b), "*Expressly advocating* means any communication that . . . [w]hen taken as a whole . . . could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) . . . ." The regulation thus shifts the focus of the express advocacy determination away from the words themselves to the overall impressions of the hypothetical, reasonable listener or viewer. This is precisely what *Buckley* warned against and prohibited. *Buckley* recognized that the distinction between "express advocacy" and "issue advocacy" can easily "dissolve in practical application." *Buckley*, 424 U.S. at 42. In no event, the Court said, could the distinction depend on the understanding of the audience. This, the Court said, would put "'the speaker . . . wholly at the mercy of the varied understanding of his hearers.'" *Id.* at 43 (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)). Relying on audience impression to determine the advocacy category would "compel[ ] the speaker to hedge and trim" and curtail the right of free expression. *Id.* (quoting *Thomas*, 323 U.S. at 535). *See also CAN II*, 110 F.3d at 1057 (noting that the Supreme Court in *Buckley* "warned of the constitutional pitfalls in subjecting a speaker's message to the unpredictability of audience interpretation"). This led the Supreme Court to make the speaker's words the focus of the inquiry and to limit the FEC's regulatory authority to expenditures for "express words of advocacy." As the district judge in Maine, whose reasoning in striking down the regulation was adopted by the First Circuit, said: "What the Supreme Court did was draw a bright line that may err on the side of permitting things that affect the election process, but at all costs avoids restricting in any way, discussion of public issues." *MRLC*, 914 F. Supp. 8, 12 (D. Me.), *aff'd per curiam*, 98 F.3d 1 (1st Cir. 1996).

11 C.F.R. § 100.22(b) defines express advocacy with reference to the reasonable listener's or reader's overall impression of the communication. That is prohibited by *Buckley* and *MCFL*, which limit the meaning of "express advocacy" to clear words that "directly fit the term," *MRLC*, 914 F. Supp. at 12, "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject,'" *Buckley*, 424 U.S. at 44 n.52. The regulation goes

too far because it shifts the determination of what is "express advocacy" away from the words "in and of themselves" to "the unpredictability of audience interpretation." *CAN II*, 110 F.3d at 1051, 1057. For that reason, we hold that the regulation violates the First Amendment.

### B.

The FEC ends its argument that 11 C.F.R. § 100.22(b) is constitutional with the following comment: "if the express advocacy requirement is read too narrowly, the prohibitions of 2 U.S.C. [§] 441b will require little more than careful diction and will do almost nothing to prevent millions of dollars from the general treasuries of unions and corporations from directly influencing federal elections, and from doing so without disclosing to the public the source of the influence." Opening Br. for FEC at 58. That is a powerful statement, but we are bound by *Buckley* and *MCFL*, which strictly limit the meaning of "express advocacy." If change is to come, it must come from an imaginative Congress or from further review by the Supreme Court.

### V.

The next issue we must address is whether the scope of the district court's injunction is too broad. As a general matter, we review the grant of a permanent injunction for abuse of discretion. Of course, underlying factual findings are reviewed for clear error, and legal conclusions are reviewed de novo. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 939 (4th Cir. 1995). Because the FEC challenges the *scope* of the district court's injunction, our review is for abuse of discretion. *See Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698, 703 (4th Cir. 1999). We conclude that the district court abused its discretion by issuing a nationwide injunction, an injunction that prevents the FEC from enforcing the regulation against any party anywhere in the United States. This injunction is broader than necessary to afford full relief to VSHL. The injunction also encroaches on the ability of other circuits to consider the constitutionality of 11 C.F.R. § 100.22(b).

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*

*v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction should be carefully addressed to the circumstances of the case. *See Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) ("Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation."); *Consolidation Coal Co. v. Disabled Miners*, 442 F.2d 1261, 1267 (4th Cir. 1971) (calling an injunction an "extraordinary writ" which "should be tailored to restrain no more than what is reasonably required to accomplish its ends"). Nationwide injunctions are appropriate if necessary to afford relief to the prevailing party. *See Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1988). For instance, in *Richmond Tenants Org. v. Kemp*, 956 F.2d 1300 (4th Cir. 1992), a nationwide injunction prohibiting the eviction of public housing tenants without notice and a hearing was appropriate because the plaintiffs were tenants from across the country. *See id.* at 1302, 1309.

In this case VSHL is the only plaintiff. An injunction covering VSHL alone adequately protects it from the feared prosecution. *See Right to Life of Dutchess County Inc. v. FEC*, 97 Civ. 2614 (SHS) (S.D.N.Y. July 20, 1998) (order clarifying that injunction shall only apply to the plaintiff). Preventing the FEC from enforcing 11 C.F.R. § 100.22(b) against other parties in other circuits does not provide any additional relief to VSHL. *Cf. Meinhold v. United States Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994) (holding that discharged serviceman challenging ban on gays in the military was entitled only to reinstatement and an injunction prohibiting military from applying the ban to him).

There is another reason why a nationwide injunction prohibiting the FEC from proceeding against any other party is inappropriate in this case. The broad scope of the injunction has the effect of precluding other circuits from ruling on the constitutionality of 11 C.F.R. § 100.22(b). Such a result conflicts with the principle that a federal court of appeals's decision is only binding within its circuit. *See United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994); *Right to Life of Dutchess County, Inc. v. FEC*, 6 F. Supp. 2d 248, 252 (S.D.N.Y. 1998) (*RLDC*) (refusing to view the First Circuit's decision as binding on it). A contrary policy would "substantially thwart the development of important questions of law by freezing the first final

decision rendered on a particular legal issue." *United States v. Mendoza*, 464 U.S. 154, 160 (1984). It would also deprive the Supreme Court of the benefit of decisions from several courts of appeals. *See id.*

VSHL argues for a nationwide injunction based on the language of the "Scope of review" section of the Administrative Procedure Act (APA), which provides that agency action can be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). VSHL maintains that pursuant to this section the proper scope of injunctive relief is an order setting aside the unconstitutional regulation for the entire country. Nothing in the language of the APA, however, requires us to exercise such far-reaching power. *See RLDC*, 6 F. Supp. 2d at 253. Furthermore, accepting VSHL's argument would result in the same harm as upholding the nationwide injunction. The FEC would no longer be allowed to defend its regulation in front of other courts of appeals. We would in effect be imposing our view of the law on all the other circuits. *See Bresgal*, 843 F.2d at 1170 ("The courts have not prevented agencies from applying varying interpretations in different circuits . . . ."); *RLDC*, 6 F. Supp. 2d at 253 (rejecting the same argument because of the "well-settled principle" that "decisions in one circuit are not binding on district courts in another circuit"). We must allow the FEC, if it chooses, to press its position in those circuits that have not yet ruled on the constitutionality of 11 C.F.R. § 100.22(b).

For these reasons, we remand the case to the district court for a modification of the injunction. The amended injunction should be limited to enjoining the FEC from enforcing 11 C.F.R. § 100.22(b) against VSHL alone anywhere in the country.

## VI.

VSHL cross-appeals because the district court did not award it all of the relief it sought. Specifically, the district court did not order the FEC to open a rulemaking to consider the repeal of 11 C.F.R. § 100.22(b). (VSHL had sought such a rulemaking in its petition to the FEC.) We reject VSHL's request that we order the FEC to open a rulemaking because VSHL is receiving complete relief. We have held that the regulation is unconstitutional, and we have authorized an

injunction that prohibits the FEC from enforcing the regulation against VSHL.

## VII.

In sum, we conclude that VSHL has standing and that its case is ripe for review. On the merits, we affirm the district court's order awarding summary judgment to VSHL on the ground that 11 C.F.R. § 100.22(b) is unconstitutional. However, we vacate the nationwide injunction covering all parties in the United States, and we remand for an amendment of the injunction that limits its protection to VSHL. Finally, we reject VSHL's cross-appeal for a rulemaking because VSHL is already receiving complete relief.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*